HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
  ambere@haelaw.com
AARON M. OLSEN (259923)
  aarono@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: 619/342-8000
Facsimile: 619/342-7878

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHREYAS SINDAGHATTA,
Individually and on Behalf of All
Others Similarly Situated,

                              Plaintiff,

        vs.

FIRST AMERICAN FINANCIAL
CORPORATION and FIRST
AMERICAN TITLE INSURANCE
COMPANY,

        Defendants.

Case No.: _____ '19CV1083 BEN RBB

CLASS ACTION COMPLAINT FOR:

(1)   VIOLATION CALIFORNIA'S
      UNFAIR COMPETITION LAW
      (CAL. BUS. & PROF. CODE
      §17200, *ET SEQ.*);
(2)   NEGLIGENCE;
(3)   BREACH OF CONTRACT;
(4)   BREACH OF IMPLIED
      CONTRACT;
(5)   BREACH OF IMPLIED
      COVENANT OF GOOD FAITH
      AND FAIR DEALING; and
(6)   MONEY HAD & RECEIVED.

DEMAND FOR JURY TRIAL

HAEGGQUIST & ECK, LLP

Plaintiff Shreyas Sindaghatta ("Plaintiff"), by and through undersigned counsel, individually and on behalf of all others similarly situated, alleges the following claims and causes of action against Defendants First American Financial Corporation and First American Title Insurance Company (collectively, "First American"), based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based upon, inter alia, the investigation conducted by and through Plaintiff's counsel as follows:

## NATURE OF THE ACTION

1.     Title insurance protects property buyers and mortgage lenders against defects or problems with a title when there is a transfer of property ownership. Thus, if a title dispute arises during a sale, the title insurance company may be responsible for paying specified legal damages, depending on the policy.

2.     Issuing title insurance is a two-part process. First, the title company researches records to make sure there are no undisclosed heirs to the property, unpaid taxes, pending legal action, errors, fraud or other problems with the deed. Put simply, the title must be clean, verifying that the seller really does own the property and is free to sell it to the prospective buyer.

3.     Next, the title company contracts with an underwriting company to issue an insurance policy that will pay for the buyer's defense if anyone challenges the buyer's title and compensate the buyer for his or her equity if they lose.

4.     Homebuyers typically need two title insurance policies: an owner's policy and a lender's policy, which protects the lender.

5.     First American is one of the nation's largest and most profitable title insurance companies that provides the services above-described, among other title and mortgage-related services.  It is a Fortune 500 company with billions of dollars in annual revenues.

6. When a prospective homebuyer or seller hires First American as the title insurance company for a particular transaction, the buyer and/or seller must provide First American with – and First American collects – a significant amount of personal information, including, among other things, bank account numbers and statements, mortgage and tax records, Social Security numbers. wire transaction receipts, driver's license images, and birthdates (hereinafter "Personal Information" or "PII").

7. Such PII is provided to First American – and First American collects such PII – pursuant to an express Privacy Policy contained **both** on First American's website **and** in its form "Commitment for Title Insurance," the contract issued by First American for title insurance.

8. Among other things, First American guarantees in these Privacy Policies that it is "committed to safeguarding customer information" and "will not release your information to nonaffiliated third parties."

9. First American also promises, in clear and unambiguous terms, that it will keep its customers' PII safe:

## Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

HAEGGQUIST & ECK, LLP

3

10.    Notwithstanding these promises, which formed a contract with First American customers, among others, on May 24, 2019, renowned data security expert Brian Krebs reported that First American's website, firstam.com, leaked upwards of 885 million records and that "anyone who knew the URL for a valid document at First American's website could view [the PII of any customer] just by modifying a single digit in the link."[1]  This leak went on, undetected, for an astonishing *16 years – at least!*

11.    First American never notified any of its customers – home buyers and sellers – of the massive exposure of their PII.

12.    In response to the *Krebs* story, First American admitted that the unprecedented exposure of its customers' PII may have been caused by "a design defect in one of its production applications."  In an emailed statement to Reuters, First American further stated: "We are currently evaluating what effect, if any, this had on the security of customer information. We have hired an outside forensic firm to assure us that there has not been any meaningful unauthorized access to our customer data."

13.    Thus far, First American has not notified any of its millions of customers whether their PII has been exposed to persons or entities with no right to possess their PII, nor has First American offered to assist its customers in remediating actual identity or credit theft caused by First American's misconduct.[2]

---

[1]  *First American Financial Corp. Leaked Hundreds of Millions of Title Insurance Records*, KREBS ON SECURITY (May 24, 2019), https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/ (last visited May 27, 2019).

[2]  First American now has a link on its website directing customers that: "If you received a title insurance policy or escrow/closing services from First American Title Insurance Company or its affiliates on or after January 1, 2003, you can learn more about enrolling in credit monitoring services

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

14.     First American's statements and promises of security ring hollow. First American has blatantly disregarded customer privacy and failed to employ the security measures necessary to protect customers' PII.

15.     People who use First American's services pay First American hundreds and sometimes thousands of dollars based, at least in part, on the promises that their PII will remain secure.  By failing to live up to its guarantees of security of its customers' PII, these customers lost the benefit of their bargain with First American and lost money as a direct and proximate result therefrom.

16.     This Class Action Complaint is filed on behalf of all persons, described more fully in the following sections, whose PII held by First American was exposed by First American's failure to abide by its own commitments of privacy and security.  Plaintiff here has suffered actual harm, including, but not limited to, the lost money paid to First American for the privacy and security of his PII.  The exposure of the Plaintiff's and Class members' PII has also caused them to be at an increased risk of real, future harm.  Plaintiff and Class members are further damaged as their PII remains in First American's possession, without adequate protection.

17.     Plaintiff seeks an order: (i) requiring First American to remediate its security measures; (ii) awarding damages and all other available legal relief to Plaintiff and the proposed Class members; and (iii) enjoining First American from continuing to inadequately safeguard its customers' PII.

---

at experianidworks.com/firstamor by calling 855-200-2743."  The link takes customers to a "complimentary Experian IdentityWorks membership" website. The Terms and Conditions of the membership include a mandatory, binding arbitration clause, which prevents users from taking part in a class action lawsuit should Experian be negligent with their information or experience a data breach.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendant's home state.

19.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over First American because it maintains its principal headquarters in Santa Ana, California, regularly conducts business in California, and has sufficient minimum contacts in California.  In addition, Plaintiff's claims arise out of Defendant's conducting and transacting business in California, and many of the action giving rise to the Complaint took place in this District.

20.    Venue is proper under 28 U.S.C. §1391(c) because Defendant is a resident of this District that does business in and is subject to personal jurisdiction in this District.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by First American's governance and management personnel that led to the exposure of customers' PII.

## PARTIES

21.    Plaintiff Shreyas Sindaghatta is a natural person and First American customer.  He is a resident and citizen of San Diego, California.  When he paid First American for title insurance services, Plaintiff reasonably believed that his PII would remain private and secure in the manner promised by First American.  He also believed that First American took all reasonable, necessary, legally required, and industry standard security measures to protect that PII.  Further, Plaintiff read and relied upon First American's privacy representations.

6

Accordingly, Plaintiff contracted with First American in or around October 2014, provided a substantial amount of PII to First American, and paid sums of money to First American based, at least in part, on First American's guarantees of privacy and security of his PII as detailed herein.  First American's failure to secure Plaintiff's PII caused Plaintiff to lose the benefit of his bargain in paying First American for, among other things, the privacy and security of Plaintiff's PII, and caused Plaintiff to be at substantial increased risk of harm, including identity theft. Plaintiff will now be required to protect himself against such harm for years to come.

22.    Defendant First American Financial Corporation is a Delaware corporation with its principal executive offices and corporate headquarters located at 1 First American Way, Santa Ana, California.  First American Financial Corporation is a citizen of the States of Delaware and California.  First American Financial Corporation conducts business throughout this District, the State of California, and the United States.

23.    Defendant First American Title Insurance Company is a Nebraska corporation with its principal executive offices and corporate headquarters located at 1 First American Way, Santa Ana, California.  First American Title Insurance Company is a wholly-owned subsidiary of First American Financial Corporation. First American Title Insurance Company is a citizen of the States of Nebraska and California.    First American Title Insurance Company conducts business throughout this District, the State of California, and the United States.

## FACTUAL BACKGROUND

### A.    First American's Business and Collection of Valuable PII

24.    Founded in 1889, First American Financial Corporation is a publicly-traded, Fortune 500 company.

CLASS ACTION COMPLAINT

1    25.    Through its wholly-owned subsidiary First American Title Insurance

2    Company, First American Financial Corporation provides myriad services,

3    including:

4              (a)    title and settlement services, including title insurance for

5    residential, commercial, and homebuilders and escrow settlement;

6              (b)    asset disposition services, which includes auction, asset

7    closing, REO title and direct production services;

8              (c)    equity services, which includes settlement, signature, and

9    national recording services;

10             (d)    due diligence, which includes ALTA land title survey and

11   coordination, ExpressMap, flood elevation certificates and determinations, and

12   zoning reports;

13             (e)    disclosure reports, which includes natural hazard disclosure

14   report; 1031 exchange, which includes delayed, improvement build-to-suit,

15   personal property, and reverse exchanges;

16             (f)    UCC services, which includes EAGLE 9 UCC insurance

17   policy for buyers, lenders insurance policy, foreclosure notice policy, and vacation

18   interest policy;

19             (g)    trustee services, which includes direct source entry and review,

20   foreclosure processing, senior lien monitoring, and loss mitigation for borrower

21   assistance;

22             (h)    loss mitigation title, which includes, property reports for

23   residential, document retrieval, property reports for commercial, and lien priority

24   insurance;

25             (i)    foreclosure title, which includes national foreclosure title,

26   mortgage priority reporting, trustee sale guarantee, and trustee services;

27

28

HAEGGQUIST & ECK, LLP

8

(j)    non-national foreclosure title, which includes commercial foreclosure for southwest; and

(k)    software solutions, which includes solutions to real estate agents and brokers, lenders, homebuyers and sellers, commercial property professionals, homebuilders and developers, and title agents and attorneys.

26.    In connection with its provision of each of the aforementioned services, for which First American charges fees ranging from several hundred dollars to thousands of dollars, First American collects from its customers a substantial amount of highly-sensitive and confidential PII (defined above).

27.    First American collects such PII, and receives payment from its customers in return for, among other things, securing the privacy of the collected PII, based expressly on several clear guarantees.

28.    Both in First American's online Privacy Policy, which has not been updated in several years, and in its form "Commitment for Title Insurance," the contract issued by First American for title insurance, First American promises its customers that, in exchange for using and paying for First American's services,

## We Are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

29.    More importantly, First American further promises:

### Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

30.     Plaintiff and the Class would not have used First American's services, much less paid them for those services (or would have paid them less), had they known that First American was not going to live up to its own contractual promises of "Confidentiality and Security."

31.     Notwithstanding First American's express representations regarding data security, as alleged in detail herein, First American's inadequate data security directly resulted in the exposure of at least 885 million records of PII of First American's customers for at least the last 16 years.

32.     As a result, First American's representations about its data security and the privacy of PII were false and/or incomplete.

**B.      The May 24, 2019 Reporting of the Exposure**

33.     On May 24, 2019, renowned data security expert Brian Krebs reported that First American's website, firstam.com, leaked upwards of 885 million records and that "anyone who knew the URL for a valid document at First American's website could view [the PII of any customer] just by modifying a single digit in the link."[3]  This leak went on, undetected, since at least 2003.

34.     There was *no authentication required* — such as a password or other checks — to prevent access to other sensitive PII.

35.     According to Krebs, "Many of the exposed files are records of wire transactions with bank account numbers and other information from home or property buyers and sellers."

---

[3]  *First American Financial Corp. Leaked Hundreds of Millions of Title Insurance Records*, KREBS ON SECURITY (May 24, 2019), https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/ (last visited May 27, 2019).

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

36.     Upon the reporting by Krebs, First American explained the apparent cause, to-wit:

> On May 24, First American learned of a design defect in one of its production applications that made possible unauthorized access to customer data. Security, privacy and confidentiality are of the highest priority and we are committed to protecting our customers' information. Therefore, the company took immediate action to address the situation and shut down external access to the application. We are currently evaluating what effect, if any, this had on the security of customer information. We have hired an outside forensic firm to assure us that there has not been any meaningful unauthorized access to our customer data.

37.     Although First American took its website down (temporarily), many of the documents were still cached in search engines, security researcher John Wethington told TechCrunch, a website dedicated to technology news.  Indeed, some 6,000 documents were ***still exposed*** following the disclosure, First American admitted, although promised that the company was "taking the appropriate steps to remove the cache in question from the search engines."

38.     Thus, for an incredible 16-year period, nearly 900 million records of Plaintiff's and the Class' sensitive and confidential PII could easily be accessed to without their consent and in breach of First American's contract with them.

**C.     The Exposed PII Is Very Valuable, as Recent Events Have Demonstrated**

39.     The types of information exposed and likely compromised by First American's contractual breach is highly valuable to identity thieves, among other third parties.

40.     The PII exposed and likely compromised, including, among other things, bank account information, Social Security numbers, driver's license images (containing picture, signature, ID number, address, height, weight, eye color, etc.)

11

HAEGGQUIST & ECK, LLP

1  can be used by identity thieves and other bad actors to gain access to a variety of

2  other existing applications, accounts, and websites.

3     41.    Identity thieves can also use the PII to harm Plaintiff and Class

4  members through embarrassment, blackmail, or harassment in person or online, or

5  to commit other types of fraud including obtaining ID cards or driver's licenses,

6  fraudulently obtaining tax returns and refunds, and obtaining government benefits.

7  A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

13     42.    In addition to out-of-pocket expenses that can reach thousands of

14  dollars for the victims of new account identity theft, and the emotional toll identity

15  theft can take, some victims have to spend what can be a considerable amount of

16  time to repair the damage caused by the identity thieves. Victims of new account

17  identity theft, for example, must correct fraudulent information in their credit

18  reports and monitor their reports for future inaccuracies, close existing bank

19  accounts and open new ones, and dispute charges with individual creditors.

20     43.    To put it into context, as demonstrated in the chart below, the 2013

21  Norton Report, based on one of the largest consumer cybercrime studies ever

22  conducted, estimated that the global price tag of cybercrime was around $113

23  billion at that time, with the average cost per victim being $298 dollars.



44.    The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the PII they have obtained.  Indeed, in order to protect themselves, Plaintiff and Class members will need to remain vigilant against unauthorized data use for years and decades to come.

45.    Once stolen, PII can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as First American and is only accessible using a Tor browser (or similar tool), which aims to conceal customers' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and PII.  Websites appear and disappear quickly, making it a very dynamic environment.

46.    Once someone buys PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details.  During that process, other sensitive data may be harvested from the

victim's accounts, as well as from those belonging to family, friends, and colleagues.

**D.    The Full Extent of the Fallout from the Breach Is Not Yet Known; However, Plaintiff and Other Class Members Have Incurred Damages Related to the Benefit of the Bargain They Had with First American**

47.    First American claims that it is "currently evaluating what effect, if any, this had on the security of customer information."

48.    Thus, while First American claims to have contained the exposure and fixed the vulnerability, it concedes that it does not know who was affected.

49.    What is clear, however, is that affected customers' intimate PII were laid bare to attackers who, by all reasonable accounts, intend to use that PII for their own commercial and financial gain and/or to do them great harm.  Indeed, customers paid *more* for First American's services than they would have paid had they known that First American would not have used adequate (and, indeed, absolutely no) security measures to protect customers' PII.  What is also clear is that, for all its decades of promises, including very recent and high-profile incidents pointing to its inadequate security and privacy controls, First American has failed and continues to fail to implement a system capable of protecting customers' PII, and its customers' did not receive the benefit of their bargain when paying for First American's services.

## CLASS ACTION ALLEGATIONS

50.    Pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of all others similarly situated, bring this lawsuit on behalf of himself and as a class action on behalf of the following "Class":

> All persons who paid First American for services in the United States and whose PII was exposed, accessed, compromised, or obtained from First American without consent.

HAEGGQUIST & ECK, LLP

51. Excluded from the Class are First American and any entities in which First American or its subsidiaries or affiliates have a controlling interest, and First American's officers, agents, and employees.

52. **Numerosity**: The members of the Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiff reasonably believes that Class members number at least tens of millions of people. The names and addresses of Class members are identifiable through documents maintained by First American.

53. **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

(a) Whether First American represented to the Class that it would safeguard Class members' PII;

(b) Whether First American owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

(c) Whether First American breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

(d) Whether Plaintiff's and Class members' PII was exposed, accessed, compromised, or obtained without their consent;

(e) Whether First American knew about the exposure before it was announced to the public and failed to timely notify the public;

(f) Whether First American's conduct was an unlawful or unfair business practice under Cal. Bus. & Prof. Code §17200, *et seq.*;

(g) Whether First American's conduct violated Cal. Bus. & Prof. Code §22575, *et seq.*;

(h) Whether First American's conduct violated Section 5 of the FTC Act, 15 U.S.C. §45, *et seq.*;

15

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

(i)     Whether Plaintiff and Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

(j)     Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

54.    First American engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually and on behalf of Class members.   Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

55.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the respective Class because, among other things, Plaintiff and Class members were injured through the substantially uniform misconduct by First American.  Plaintiff is advancing the same claims and legal theories on behalf of himself and Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class members arise from the same operative facts and are based on the same legal theories.

56.    **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of Class members; he has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously.    Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

57.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action.  The damages, harm, or other financial detriment suffered individually by

16

HAEGGQUIST & ECK, LLP

Plaintiff and Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against First American, making it impracticable for Class members to individually seek redress for First American's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

58.    Further, First American has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Fed. R. Civ. P. 23(b)(2).

59.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(a)    Whether and what Class members' PII was exposed, accessed, compromised, or obtained without consent;

(b)    Whether (and when) First American knew about the security vulnerability leading to the exposure and whether failed to properly and timely repair the vulnerability;

(c)    Whether First American owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

(d)    Whether First American breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

HAEGGQUIST & ECK, LLP

17

CLASS ACTION COMPLAINT

1    (e)    Whether First American's conduct was an unlawful or unfair

2 business practice under Cal. Bus. & Prof. Code §17200, *et seq.*;

3    (f)    Whether First American's representations that its collected PII

4 was secure were facts that reasonable persons could be expected to rely upon when

5 deciding whether to pay for First American's services;

6    (g)    Whether First American misrepresented the security of its

7 systems and collected PII, and its ability to safely store Plaintiff's and Class

8 members' PII;

9    (h)    Whether First American failed to comply with its own policies

10 and applicable laws, regulations, and industry standards relating to data security;

11    (i)    Whether First American's acts, omissions, misrepresentations,

12 and practices were and are likely to deceive Plaintiff and the Class;

13    (j)    Whether First American knew or should have known that it did

14 not employ reasonable measures to keep Plaintiff's and Class members' PII secure

15 and to prevent the exposure, loss, or misuse of that information;

16    (k)    Whether First American's conduct violated Cal. Bus. & Prof.

17 Code §22575, *et seq.*;

18    (l)    Whether First American is a commercial website or online

19 service that collects personally identifiable information through the Internet about

20 individual consumers residing in California, and elsewhere, who use or visit its

21 commercial Web site or online services, within the meaning of Cal. Bus. & Prof.

22 Code §22575(a);

23    (m)    Whether First American failed to adhere to its posted Privacy

24 Policy concerning the care it would take to safeguard Plaintiff's and Class

25 members' PII in violation of Cal. Bus. & Prof. Code §22576;

26

27

28

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

(n)    Whether First American negligently and materially failed to adhere to its posted Privacy Policy with respect to the extent of their disclosure of customers' data, in violation of Cal. Bus. & Prof. Code §22576;

(o)    Whether a contract existed between First American and Plaintiff and Class members, and the terms of that contract;

(p)    Whether First American breached the contract by having inadequate safeguards to secure PII;

(q)    Whether an implied contract existed between First American and Plaintiff and Class members and the terms of that implied contract;

(r)    Whether First American breached the implied contract;

(s)    Whether First American violated the covenant of good faith and fair dealing implicit in such contract;

(t)    Whether First American made representations regarding the supposed secure nature of it's the PII it collects;

(u)    Whether such representations were false with regard to storing and safeguarding Plaintiff's and Class members' PII; and

(v)    Whether such representations were material with regard to storing and safeguarding Plaintiff's and Class members' PII.

## CAUSES OF ACTION

## COUNT I
### Violation of California's Unfair Competition Law
### Unlawful Business Practice
### (Cal. Bus. & Prof. Code §17200, *et seq.*)

60.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

61.    By reason of the conduct alleged herein, First American engaged in unlawful practices within the meaning of California's Unfair Competition Law

19

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

("UCL"). The conduct alleged herein is a "business act or practice" within the meaning of the UCL, and these business act or practices emanated from California.

62. First American collected and stored the PII of Plaintiff and Class members and required Plaintiff and Class members to provide PII to use First American's services. First American falsely represented to Plaintiff and Class members that their PII would be secure, that

> We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

63. First American knew or should have known that customers' PII was not secure, that it did not restrict access to customers' PII, that it did not handle PII responsibly and in accordance with the Privacy Policy, and that it did not maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard customers' nonpublic personal information. First American knew or should have known of the defects in the design of its production applications.

64. Even without these misrepresentations and omissions, Plaintiff and Class members were entitled to assume, and did assume First American would take appropriate measures to keep their PII safe. First American did not disclose at any time that Plaintiff and Class members' PII was vulnerable to theft because First American's data security measures were inadequate and there were holes and weaknesses in First American's production applications, and First American was the only one in possession of that material information, which it had a duty to

disclose.  First American violated the UCL by misrepresenting, both by affirmative conduct and by omission, the security of its customers' PII and its ability to safely store Plaintiff's and Class members' PII.  First American also violated the UCL by failing to implement reasonable and appropriate security measures or follow industry standards for data security and failing to comply with its own posted Privacy Policy and contractual commitments regarding privacy and the use of consumers' data.  If First American had complied with these legal requirements and policies, Plaintiff and Class members would not have suffered damages in the form of loss of the benefit of their bargain with First American and would not now be at an increased and imminent risk of future harm.

65.    First American's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, *inter alia*, Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and Cal. Bus. & Prof. Code §22576 (as a result of First American failing to comply with its own posted data and privacy policies).

66.    Plaintiff and Class members suffered injury in fact and lost money or property as the result of First American's unlawful business practices.  In particular, Plaintiff and Class members have suffered from a loss of the benefit of their bargain with First American in that they would not have paid First American any money, or would have at least paid less money, had they known that First American lacked the necessary safeguards to maintain the security of its customers' PII and could not comply with its own Privacy Policy and contractual commitments.  In addition, their PII is now at great risk of exposure to criminals, who intend or intended to use the PII for their own advantage, or to sell it for profit, making it clear that the leaked information is of tangible value.  Plaintiff and Class members are further damaged as their PII remains in First American's possession, without adequate protection.

67.    As a result of First American's unlawful business practices, violations of the UCL, Plaintiff and members of the Class are entitled to restitution and injunctive relief.

## COUNT II
**Violation of California's Unfair Competition Law**
**Unfair Business Practice**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

68.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

69.    By reason of the conduct alleged herein, First American engaged in an unfair "business act or practice" within the meaning of the UCL, and these business acts or practices emanated from California.

70.    First American collected and stored the PII of Plaintiff and Class members in First American's databases.  As discussed above, First American represented to Plaintiff and Class members that their PII was secure and would remain private.  First American engaged in unfair acts and business practices by misleadingly representing, *inter alia*, that PII was secure, that it restricted access to customers' PII, that it handled PII responsibly and in accordance with the Privacy Policy, and that it maintained physical, electronic, and procedural safeguards that comply with federal regulations to guard customers' nonpublic personal information, while omitting material information related to the true state of First American's data security practices and policies.

71.    Even without these misrepresentations and omissions, Plaintiff and Class members were entitled to assume, and did assume First American would take appropriate measures to keep their PII safe.  First American did not disclose at any time that Plaintiff and Class members' PII was vulnerable to theft because First American's data security measures were inadequate and there were holes and weaknesses in First American's production applications, and First American was

22

HAEGGQUIST & ECK, LLP

the only one in possession of that material information, which it had a duty to disclose.  First American violated the UCL by misrepresenting, both by affirmative conduct and by omission, the security of its customers' PII and its ability to safely store Plaintiff's and Class members' PII.  First American also violated the UCL by failing to implement reasonable and appropriate security measures or follow industry standards for data security and failing to comply with its own posted Privacy Policy and contractual commitments regarding privacy and the use of consumers' data.  If First American had complied with these legal requirements and policies, Plaintiff and Class members would not have suffered damages in the form of loss of the benefit of their bargain with First American and would not now be at an increased and imminent risk of future harm.

72.    First American knew or should have known that customers' PII was not secure, and that it did not employ adequate security measures that complied with federal and state regulations, industry standards, or its own policies and representations and that would have kept Plaintiff and Class members' PII secure and prevented the exposure of Plaintiff and Class members' PII.

73.    First American violated the UCL by misrepresenting, both by affirmative conduct and by omission, the security of, and its ability to safely collect and store, Plaintiff's and Class members' PII.  First American also violated the UCL by failing to implement and maintain reasonable security procedures and practices appropriate to protect all Class members' PII.  If First American followed the industry standards and legal requirements, Plaintiff and the Class would not have suffered benefit of the bargain damages related to the exposure of their PII and would not now be at an increased risk of harm.

74.    First American also violated its commitment to maintain the confidentiality and security of the PII of Plaintiff and Class members and failed to

HAEGGQUIST & ECK, LLP

comply with its own policies and applicable laws, regulations, and industry standards relating to customer privacy and data security.

75.    First American engaged in unfair business practices under the "balancing test." The harm caused by First American's actions and omissions, as described above, greatly outweigh any perceived utility.  Indeed, First American's failure to follow basic data security protocols and misrepresentations and omissions to consumers about privacy and about First American's data security cannot be said to have had any utility at all.  These actions and omissions were clearly injurious to Plaintiff and Class members, directly causing the harms alleged below.

76.    First American engaged in unfair business practices under the "tethering test." First American's actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature, to protect consumers from unfair and deceptive trade practices and to protect the privacy of customer data.  *See*, *e.g.*, Cal. Civ. Code §1798.1; Cal. Civ. Code §1798.81.5(a); Cal. Bus. & Prof. Code §22578; Cal. Civ. Code §1760.  First American's acts and omissions, and the injuries caused by them, are thus comparable to a violation of these laws.

77.    First American engaged in unfair business practices under the "FTC test." The harm caused by First American's actions, misrepresentations, and omissions, as described above, is substantial in that it affects millions of Class members and has caused those persons to suffer actual harms.  Such harms include a substantial risk of identity theft, exposure of Class members' PII to third parties without their consent, and benefit of the bargain damages.  This harm continues given the fact that Class members' PII remains in First American's possession, without adequate protection.  First American's actions and omissions violated, *inter alia*, Section 5(a) of the FTC Act, 15 U.S.C. §45.

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

78.    Plaintiff and Class members suffered injury in fact and lost money or property as the result of First American's unfair business practices.  In particular, Plaintiff and Class members have suffered from a loss of the benefit of their bargain with First American in that they would not have paid First American any money, or would have at least paid less money, had they known that First American lacked the necessary safeguards to maintain the security of its customers' PII and could not comply with its own Privacy Policy and contractual commitments.  In addition, their PII is now at great risk of exposure to criminals, who intend or intended to use the PII for their own advantage, or to sell it for profit, making it clear that the leaked information is of tangible value.  Plaintiff and Class members are further damaged as their PII remains in First American's possession, without adequate protection.

79.    As a result of First American's unfair business practices, violations of the UCL, Plaintiff and members of the Class are entitled to restitution and injunctive relief.

**COUNT III**
**Breach of Contract**

80.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

81.    First American's Privacy Policy and "Commitment for Title Insurance" form binding contracts between First American and each customer at the time the customer pays First American for one or more services.

82.    First American breached the contracts with respect to the provisions enumerated in paragraphs 24-32 above, including breaching its contractual promises to restrict access to customers' PII, to handle PII responsibly and in accordance with its Privacy Policy, and to maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard customers' nonpublic personal information.

25

83.    First American breached these provisions of the contracts in that they did not have proper safeguards to protect Plaintiff's and Class members' PII, in violation of Section 5(a) of the FTC Act, and did not limit access to and disclosure of that information to the specified individuals or entities outlined in its Privacy Policy.  First American violated its commitment to maintain the privacy and security of Plaintiff and Class members' PII and failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security.

84.    First American's breach of contract was a direct and legal cause of the injuries and damages suffered by Plaintiff and Class members, specifically benefit of the bargain damages.

85.    Plaintiff and Class members were also harmed as the result of First American's breach of contract terms outlined above because their PII was exposed and likely compromised, placing them at a greater risk of identity theft and subjecting them to identity theft.

86.    This breach of the contract was a direct and legal cause of the injuries and damages to Plaintiff and members of the Class, as described above.

**COUNT IV**
**Breach of Implied Contracts**

87.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

88.    To the extent that First American's Privacy Policy and Commitment for Title Insurance did not form express contracts, the retention of First American for services created an implied contract between First American and the customer, the terms of which were set forth by those relevant Privacy Policy and Commitment for Title Insurance.

89.    First American breached such implied contracts by failing to adhere to the terms of the applicable Privacy Policy and Commitment for Title Insurance,

26

HAEGGQUIST & ECK, LLP

as described above. First American breached its contractual promises to restrict access to customers' PII, to handle PII responsibly and in accordance with its Privacy Policy, and to maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard customers' nonpublic personal information.

90.    First American's breach of implied contract was a direct and legal cause of the injuries and damages suffered by Plaintiff and Class members, specifically benefit of the bargain damages.

91.    Plaintiff and Class members were also harmed as the result of First American's breach of implied contract terms outlined above because their PII was exposed and likely compromised, placing them at a greater risk of identity theft and subjecting them to identity theft.

92.    This breach of the implied contract was a direct and legal cause of the injuries and damages to Plaintiff and members of the Class, as described above.

**COUNT V**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

93.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

94.    Under California law there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

95.    Under the express and implied terms of the agreements entered into between First American and Plaintiff and Class members, Plaintiff and Class members were to benefit through the use of First American's services, while First American was supposed to benefit through payment of fees to First American and the limited use of customers' PII.

96.    First American exhibited bad faith through its conscious awareness of and deliberate indifference to the risks to Plaintiff and Class members' PII.  In doing so, First American acted well outside of commercially reasonable norms.

97.    First American, by exposing its customers to vastly greater and more harmful exploitation of their PII than they had bargained for, breached the implied covenant of good faith and fair dealing with respect to both the specific contractual terms in First American's Privacy Policy and Commitment for Title Insurance, and the implied warranties of its contractual relationships with customers.

98.    First American's breach of implied covenant of good faith and fair dealing was a direct and legal cause of the injuries and damages suffered by Plaintiff and Class members, specifically benefit of the bargain damages.

99.    Plaintiff and Class members were also harmed as the result of First American's breach of implied covenant of good faith and fair dealing because their PII was exposed and likely compromised, placing them at a greater risk of identity theft and subjecting them to identity theft.

## COUNT VI
### Negligence

100.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

101.    First American owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their PII and keeping it from being exposed, compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing First American's security systems to ensure the PII of Plaintiff and the Class was adequately secured and protected. First American further had a duty to implement processes that would detect a breach of their security system, or flaw in their applications, in a timely manner.

28
CLASS ACTION COMPLAINT

102.   First American knew that the PII of Plaintiff and the Class was personal and sensitive information that is valuable to identity thieves and other criminals.  First American also knew of the serious harms that could happen if the PII of Plaintiff and the Class was wrongfully exposed or disclosed, that exposure or disclosure was not fixed, or Plaintiff and the Class were not told about the exposure or disclosure in a timely manner.

103.   By being entrusted by Plaintiff and the Class to safeguard their PII, and contractually binding itself to Plaintiff and the Class, First American had a special relationship with Plaintiff and the Class.  Plaintiff and the Class paid for First American's services and agreed to provide their PII with the understanding that First American would take appropriate measures to protect it, and would inform Plaintiff and the Class of any breaches or other security concerns that might call for action by Plaintiff and First American.  But First American did not.  First American knew or had reason to know that its data security was inadequate.  First American is singularly culpable given the repeated security breaches and inadequate safeguards.

104.   First American breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, and allowing unfettered exposure of Plaintiff and Class members' PII.

105.   First American's failure to comply with industry standards and federal regulations further evidences First American's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII.

106.   First American either knew about or should have known about the exposure given its promises to "use [its] best efforts to train and oversee [its]

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

employees and agents to ensure your information will be handled responsibly and in accordance with [its] Privacy Policy."

107.   But for First American's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been exposed, compromised, accessed, and viewed by unauthorized persons.  First American's negligence was a direct and legal cause of the exposure of the PII of Plaintiff and the Class and all resulting damages, specifically the benefit of the bargain struck between Plaintiff and Class members and First American.

108.   The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of First American's failure to exercise reasonable care in safeguarding and protecting Plaintiff and Class members' PII.   First American knew or should have known its systems, applications, and technologies had numerous security vulnerabilities.

109.   As a result of this misconduct by First American, the PII of Plaintiff and the Class were exposed and likely compromised, not only resulting in financial damage from the loss of the benefit of their bargain, but also placing them at a greater risk of identity theft and subjecting them to identity theft.  Plaintiff and Class members are further damaged as their PII remains in First American's possession, without adequate protection.

### COUNT VII
### Money Had & Received

110.   Plaintiff repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully stated herein.

111.   Plaintiff and the Class gave First American a sum certain in the form of payments for First American services.

112.   At least part of the money Plaintiff and the Class paid First American was for the promised security of their PII.

30

113.   First American charged Plaintiff and the Class more than it should have for the services provided because First American did not adequately secure Plaintiff's; and the Class' PII.

114.   First American is indebted to Plaintiff and the Class in the certain sum of the amount of money paid to First American for security of their PII, in a specific amount to be proved at trial.

115.   First American has received money belonging to Plaintiff and the Class which equity and good conscience require should be paid to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter an Order:

A.     Certifying the Class and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.     Finding that First American's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

C.     Enjoining First American from engaging in further negligent, unfair, and unlawful business practices alleged herein;

D.     Awarding Plaintiff and Class members actual, compensatory, consequential, and nominal damages;

E.     Awarding Plaintiff and Class members restitution;

F.     Requiring First American to provide appropriate credit and identity theft monitoring services to Plaintiff and Class members;

G.     Awarding Plaintiff and Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiff and Class members reasonable attorneys' fees costs and expenses, and;

HAEGGQUIST & ECK, LLP

31

1        I.       Granting such other relief as the Court deems just and proper.

2                              **JURY TRIAL DEMANDED**

3            Plaintiff demand a trial by jury of all claims in this Class Action Complaint

4    so triable.

5    Dated: June 10, 2019                    HAEGGQUIST & ECK, LLP
                                             AMBER L. ECK
6                                            AARON M. OLSEN

7

8

9                                            By: _____

10                                                   AMBER L. ECK

11                                           225 Broadway, Suite 2050
                                             San Diego, California 92101
12                                           Telephone: 619/342-8000
                                             Facsimile: 619/342-7878
13                                           ambere@haelaw.com
                                             aarono@haelaw.com
14

15                                           Attorneys for Plaintiff and the Class
16

17

18

19

20

21

22

23

24

25

26

27

28

HAEGGQUIST & ECK, LLP